## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Gina Galantino, being sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since 2020. I am currently assigned to the Boston Field Office. I am a graduate of the Federal Law Enforcement Training Center, where I completed ATF Special Agent Basic Training and the Criminal Investigator Training Program. During the course of my law enforcement career, I have participated in the execution of state and federal search and/or arrest warrants for violations of firearms and controlled substance laws.

2.      As a Special Agent for ATF, some of my duties include conducting criminal investigations into cases of illegal possession/transfer of firearms, firearms trafficking, firearms manufacturing and violent crimes involving firearms and narcotics trafficking. Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms. I have been the affiant for federal search warrants and arrest warrants. I have participated in and performed surveillance and made arrests of firearm and narcotics traffickers who utilize their electronic devices to further their illegal activity. During the course of my professional experience, I have interviewed numerous defendants, witnesses, victims, confidential informants, and other police officers regarding the illegal trafficking of firearms.

3.      During my tenure with ATF, I have participated in the execution of federal search warrants, and have debriefed defendants, informants, and witnesses with personal knowledge regarding firearms and narcotics trafficking and the operation of firearms and/or narcotics traffickers. I have also received training through my position as an ATF Special Agent involving firearms and narcotics trafficking. Among other things, this has familiarized

1

me with: (1) the manner in which illegal guns are brought into this state and sold; (2) firearm and narcotics traffickers' methods of operation, including their acquisition, storage, and transportation of both illegal guns and drugs; and (3) the widespread utilization of cellular telephones in the course of such activities.

4. I submit this affidavit in support of an application for a criminal complaint charging Ruben Joel SANCHEZ Jr. ("SANCHEZ"), YOB 1994, for engaging in the business of dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and for being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1) (hereinafter, the "SUBJECT OFFENSES").

5. I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint. Accordingly, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.

## PROBABLE CAUSE

### Investigation Background

6. Beginning in or around May 2025, ATF and Homeland Security Investigations ("HSI") began investigating SANCHEZ for his involvement in the illegal sale of firearms. As part of the investigation, ATF/HSI received information from an HSI Cooperating Defendant ("CD-1").[1] CD-1 informed investigators that CD-1 met SANCHEZ in Boston and, as of May 2025, had

---

[1] CD-1 has a minimal criminal history with no convictions, limited to charges for operating after a suspended registration, a compulsory insurance violation, and firearm related violations. CD-1 has been supervised by multiple federal agents, including me, and has consistently been found to provide information that is credible. CD-1 is providing information to law enforcement in hopes of leniency in pending criminal proceedings in which CD-1 is charged with firearms related offenses. Based upon the investigation conducted in this matter, including independently corroborating portions of the information related by CD-1, I believe the information provided by CD-1 to be reliable.

known SANCHEZ for approximately one and a half years.

7. During this investigation, I have learned that SANCHEZ is not licensed to sell firearms.

8. I have reviewed SANCHEZ's criminal history, which includes multiple felony convictions. In Mahoning County, Ohio, Court of Common Pleas Case No. 2011 CR 1282, for example, in June 2013 SANCHEZ was sentenced to a total prison term of ten years, followed by post-release supervision for three years on two counts of Having Weapons Under Disability, a violation of Ohio Revised Code 2923.13(A)(3)(B), punishable by up to 3 years; Felonious Assault, a violation of Ohio Revised Code 2903.11(A)(2)(D), punishable by up to eight years; Firearm Specification, a violation of Ohio Revised Code 2941.145(A); and Participating in Criminal Gang, a violation of Ohio Revised Code 2923.42(A)(B), punishable by up to eight years.

### June 2025 Controlled Purchase of Firearms

9. Beginning in or around May 2025 through June 2025, CD-1 was in contact with SANCHEZ via telephone number xxx-xxx-9302 (the "9302 phone"). During these conversations, SANCHEZ and CD-1 discussed firearms and firearm sales. The two discussed Sanchez's prior sales of firearms and SANCHEZ's efforts to obtain additional firearms to sell.

10. On a date in May 2025, SANCHEZ texted CD-1, "I don't got the big one no more but I still got the Glock tho you 700$ it's a 40" and "I'm look for some more for you so that when I go down to Ohio I can come back with em." Based on my training and experience and the context of this investigation, I understand these statements to mean that SANCHEZ no longer had a large firearm for sale (the "big one"), but he still has a Glock 40 for sale for $700, and when he goes back to Ohio he will look for additional firearms and bring them back to Boston to sell to CD-1.

11. On a date in May 2025, SANCHEZ texted CD-1, "I got my n***a putting some shit together so when I go down there I can come up with it to." Based on my training and

3

experience and the context of this investigation, I understand this statement to mean SANCHEZ was working with another individual to acquire firearms in Ohio to sell to CD-1.

12. On a date in June 2025, SANCHEZ texted CD-1, "Bro I'm coming back with a lot of em I'm going down on the bus then coming back Monday or Tuesday." Based on my training and experience and the context of this investigation, I understand this to mean that SANCHEZ planned to travel to Ohio by bus to acquire "a lot of" firearms and to return to Boston with the firearms.

13. On a date in June 2025, SANCHEZ texted CD-1 a video of SANCHEZ inside of a Federally Licensed Firearms dealership (FFL), to which CD-1 replied, "so expensive in the store[.]" SANCHEZ replied, "I no bro I'm at my n***as right now see some shit," and "I got you bro I'm getting all of em for the low." Based on my training and experience and the context of this investigation, I understand this to mean SANCHEZ was acquiring the firearms from a friend for a lower rate and not necessarily directly from the FFL.

14. On a date in June 2025, SANCHEZ texted CD-1, "yo bro don't for about me i don't even have a job no more because I did this shit I need that," to which CD-1 replied, "I understand and thank you brother count on that thank you that's why I'll give you 200 more." SANCHEZ replied, "Ok koo next time I come back I come back with big shit." Based on my training and experience and the context of this investigation, I understand this to mean that SANCHEZ "need[ed]" the money he obtains through firearm sales and uses firearm sales as a source of income.

15. On a date in June 2025, SANCHEZ met CD-1 in person and informed CD-1 that he had three firearms for sale that he had acquired while he was in Ohio: a Ruger, GP100, .357 caliber revolver; a P80, 9mm pistol; and a Springfield Armory, Hellcat, 9mm pistol, for a total of $3,800. SANCHEZ had the firearms with him and showed them to CD-1 at that time. CD-1 agreed

4

to purchase the firearms at a later date in Boston, MA. This meeting was not recorded. CD-1 did, however, take a photo of the firearms and shared them with investigators.

16. On a phone call, SANCHEZ agreed to meet CD-1 in Boston, MA on June 12, 2025 to sell the three firearms referenced above. This phone call was not recorded. CD-1 relayed the contents to investigators.

17. On or around June 12, 2025, CD-1 met law enforcement officers at a meeting location prior to the scheduled purchase of the firearms. Law enforcement officers first searched CD-1's vehicle for money and contraband, with negative results. Agents then provided CD-1 with government funds and a recording device that was placed inside CD-1's vehicle to record the sale. Investigators then directed CD-1 to make a controlled purchase of the firearms that had been discussed with SANCHEZ. Agents conducted surveillance while CD-1 drove to a prearranged location in Boston to meet SANCHEZ, throughout the transaction, and as CD-1 drove back to a prearranged meet location to meet with investigators.

18. The recording device in CD-1's car captured video and audio of the sale. SANCHEZ entered the passenger seat of CD-1's vehicle and spoke to CD-1. I have reviewed an unofficial translation of the audio of their conversation.[2] According to the translation, CD-1 asked SANCHEZ to "try and cop two long ones," which I understand to refer to rifles. SANCHEZ replied, "I'mma bring. Now there is money." A short time later, CD-1 stated, "bring at least two kid," and SANCHEZ replied that he would "bring two or three" and "hook you up."

19. Shortly after entering the car, SANCHEZ removed firearms from a bag and handed them to CD-1 in exchange for $4,000 in pre-recorded ATF funds. CD-1 then placed the firearms into a separate bag and positioned it in the backseat of the vehicle. SANCHEZ counted the money

---

[2] The translation was provided by an HSI Task Force Officer who is a native Spanish speaker.

he received from CD-1 while the conversation continued. A short time later, SANCHEZ exited the vehicle, and CD-1 departed the area.

20. CD-1 was then led back to the prearranged meeting location by ATF. At the designated meeting location, CD-1 transferred the firearms purchased from SANCHEZ to the agents. The three firearms were: a Ruger, GP100, .357 caliber revolver, bearing serial number 176-97062; a Springfield Armory, Hellcat, 9mm pistol, bearing serial number BA605548; and a P80, 9mm pistol, bearing no serial number.

21. Based on my training and experience, I know that a Springfield Armory, Hellcat pistol is manufactured in Croatia by HS Produkt, and then imported and sold in the U.S. by Springfield Armory, based in Geneseo, Illinois. In my training and experience I also know that a Ruger, GP100, revolver is manufactured in the United States by Sturm, Ruger & Co., with production facilities in places like Prescott, Arizona and Newport, New Hampshire.

**June 2025 Attempted Second Controlled Purchase of Firearms**

22. Later in June 2025, CD-1 was in communication with SANCHEZ to facilitate a second controlled purchase. On a date in June 2025, CD-1 texted SANCHEZ, "Are you here in Boston or did you leave?" SANCHEZ replied, "Ohio," and included two photos and one video of firearms. The following day, SANCHEZ asked, "Yo you seen what I sent you yesterday," and CD-1 replied, "Yes," and "How many can you bring me??" SANCHEZ replied, "4 of the big ones." CD-1 stated, "Ok good," and "And little one?" SANCHEZ stated, "You a want a lil one to," and CD-1 replied, "3 little ones can get." SANCHEZ replied, "Ok and what about the big shit you wanted," and CD-1 replied, "I love them so much." SANCHEZ stated, "I no I want to come back on Monday," and CD-1 replied "How many will you bring me 4 big ones?" SANCHEZ replied, "Yes," and "Monday." Based on my training and experience and the circumstances of this investigation, I understand SANCHEZ to be telling CD-1 that he could bring him four rifles the

6

following Monday.

23. A short time later, SANCHEZ stated, "I'm bringing 4 big ones and like 2. 3 lil one but I want to see if you can cell this bike for me I'm bringing it up there in a U-Haul bro." Based on my training and experience and the circumstances of this investigation, I understand this to mean that SANCHEZ was planning to bring four rifles and two or three handguns, and that he would be traveling by car with a U-Haul. A couple days later, CD-1 one stated, "How are you bro? What time will you be here tomorrow?" SANCHEZ replied, "I live at 7:30 8:00 to night I will be there at like 1 or 2 tomorrow." CD-1 replied, "ok good bro." A short time later, SANCHEZ stated, "A about to jump in the on the road with m b there tomorrow ok," and CD-1 replied, "Good Good," and SANCHEZ said, "Ok seee you tomorrow."

24. The following day, CD-1 reached out to SANCHEZ via text message to confirm what time he would arrive in Boston, but did not hear back.

25. According to a Campbell Police Department report, SANCHEZ was arrested on June 16, 2025 in Campbell, Ohio by Campbell Police Department on two active warrants.

26. Law enforcement personnel in Ohio informed investigators that SANCHEZ was released at some point in October 2025.

27. In or around November 2025, CD-1 contacted SANCHEZ on the phone. SANCHEZ informed CD-1 that he will be back in Boston in a couple months with firearms for sale.

### January 2026 Controlled Purchase of Firearms

28. On a date in January, 2026, SANCHEZ sent CD-1 a video including what appeared to be two pistols (one with an extended magazine), one rifle, and one AR-style pistol. Both the rifle and AR-style pistol were equipped with 100-round drums. SANCHEZ informed CD-1 that a female was driving him from Ohio to Boston, and that he planned to arrive in Boston on Thursday,

January 8, 2026. CD-1 agreed to purchase those firearms in Boston, MA on January 8, 2026 for $8,500.

29. During the morning of January 8, 2026, CD-1 confirmed with SANCHEZ that he was on his way to Boston from Ohio and would be in Boston shortly.

30. On January 8, 2026, law enforcement officers first searched CD-1's vehicle for money and contraband, with negative results. Agents then provided CD-1 with government funds and a recording device for use in the controlled purchase. Investigators conducted surveillance while CD-1 drove to a prearranged location in Boston, MA to meet SANCHEZ and throughout the operation. Agents surveilled the meeting through the recording device in CD-1's vehicle and through physical surveillance at the meeting location.

31. SANCHEZ arrived at the predetermined meeting location in a vehicle driven by a female. SANCHEZ got out of the vehicle and walked to CD-1's vehicle. SANCHEZ got into CD-1's car. When SANCHEZ entered CD-1's car, he did not have the firearms with him. CD-1 asked him where the firearms were located. SANCHEZ then exited CD-1's vehicle and returned to the vehicle he had arrived in. At that vehicle, he retrieved a white bag. He then handed the white bag to CD-1 through the driver's window of CD-1's vehicle. SANCHEZ then returned to the vehicle he had arrived in and retrieved two apparent rifles. Those firearms were not in a bag. SANCHEZ carried them to CD-1's vehicle and entered the passenger side of CD-1's vehicle.

32. CD-1 then handed SANCHEZ the $8,500. SANCHEZ appeared to attempt to count the money and then put it in his pants.

33. Agents then placed SANCHEZ under arrest. Agents searched SANCHEZ's person incident to arrest and recovered the $8,500 and seized a cell phone from his person.

34. Agents also recovered the four firearms. After inspecting the firearms, agents determined that they were: a DPMS, model A-15, caliber .223-5.56, SN: DNWC014428, equipped

with a loaded 100-round drum; Radical Firearms LLC, model RF-15, multi caliber, SN: 24-011682, equipped with a loaded 100-round drum; a loaded Smith & Wesson, model MP9, 9mm, SN:NBA9876; and a loaded Ruger, model p95, caliber 9mmx19, SN: 318-25614, equipped with an extended magazine. I am aware, based on my training and experience, that Ruger does not manufacture firearms in Massachusetts, and that no ammunition is manufactured in Massachusetts, such that those items necessarily traveled in interstate commerce.

## CONCLUSION

35.  Based on the foregoing, I submit that there is probable cause to believe that:

   a.  from at least in or about May 2025 to January 8, 2026, SANCHEZ, without being a federally licensed dealer, did knowingly and willfully engage in the business of dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A); and

   b.  on or about January 8, 2026, knowing that he was previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess, in and affecting commerce, firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1).

Respectfully submitted,

_Gina Galantino_
Gina Galantino
Special Agent, ATF

Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 this 8th day of January, 2026.

_David H. Hennessy_
HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

5:08 p.m.